UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHARYL A. CUMMINGS BELTON, : |  |
|     Plaintiff, : |  |
| : |  |
| v. : | No. 3:15cv1616 (DJS) |
| : |  |
| NANCY A. BERRYHILL,[1] : |  |
| ACTING COMMISSIONER OF : |  |
| SOCIAL SECURITY, : |  |
|     Defendant. : |  |

RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S
MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of an application filed by the plaintiff, Sharyl A. Cummings Belton ("Belton"), for disability insurance benefits ("DIB").[2] It is brought pursuant to 42 U.S.C. §§ 405 (g) and 1383 (c)(3).

Belton now moves for judgment on the pleadings, seeking an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner"). In the alternative, Belton seeks an order remanding her case for a rehearing. The Commissioner, in turn, has moved for an order affirming her decision.

---

[1]Nancy A. Berryhill is now the Acting Commissioner of Social Security and is therefore substituted for Carolyn W. Colvin as the defendant pursuant to Fed. R. Civ. P. 25(d).

[2]Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* 20 C.F.R. §§ 404.929 *et seq*. Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §404.967. If the Appeals Council declines review or affirms the ALJ opinion, the claimant may appeal to the United States district court. Section 205 (g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405 (g).

The issues presented are whether the ALJ: (1) properly determined that Belton did not have a condition that met or exceeded the severity requirements of an impairment listed in the pertinent regulations; (2) properly applied the treating physician rule; and (3) properly evaluated Belton's credibility with regard to her symptoms. For the following reasons, Belton's motion for judgment on the pleadings is denied, and the Commissioner's motion for an order affirming her decision is granted.

## FACTS

An examination of the record discloses the following: On July 19, 2012, Belton filed an application for DIB.[3] for an alleged disability that commenced on March 15, 2012.[4] On October 24, 2012, her application was denied, and on April 17, 2013, her request for reconsideration was denied.

On May 16, 2014, Belton appeared with counsel for a hearing before an ALJ. On June 3, 2014, the ALJ issued a decision denying benefits. On September 24, 2015, the Appeals Council denied Belton's request for review of that decision thereby making the ALJ's decision the final decision of the Commissioner. This appeal followed.

Belton, who was born on March 18, 1961, has a high school diploma plus one year of college. Her past relevant work was as an administrative assistant, retail manager, newspaper layout designer, cashier, take-out food clerk, personal care assistant, and teaching assistant.

---

[3]In order to be entitled to disability benefits, a claimant must "have enough social security earnings to be insured for disability, as described in § 404.130." 20 C.F.R. § 404.315 (a)(1). In this instance Belton had sufficient social security earnings to be insured through March 31, 2013.

[4]At the administrative hearing in this matter, Belton amended the alleged onset date from September 1, 2008 to March 15, 2012.

According to Belton, she left her most recent job, a teaching assistant position, in 2011 because "I had got an attack and I was sick, very sick, for three days and I didn't call. I didn't show up. So, about in the third day, I listened to my messages, and they pretty much told me if I didn't show up or call, that I was terminated. So, I never went to fight for my job, because I didn't know if I was going to get sick again or be out, and it was part time anyway. . . ."(Doc. # 9-3, at 85, p. 84).[5]

Medical Evidence

A. Dr. Samuel Bridgers

In early 2012, Belton's primary care physician, Dr. Babu Kumar, referred her to a neurologist, Dr. Samuel Bridgers, due to her history of migraine headaches. Dr. Bridgers' initial consultation note, dated January 26, 2012, reflects Belton's statements to him about her migraines:

> She will probably experience a half a dozen headaches a year, most of which can be controlled by taking Excedrin Migraine at the onset. About twice a year, the Excedrin Migraine won't work and the patient will go on to experience a severe headache with nausea, vomiting, photophobia and phonophobia. When headaches progress to this point, they usually last a few days.
> * * * *
> She denies . . . nausea and vomiting other than with headaches, . . . joint problems, depression or anxiety.

(Doc. # 9-8, at 44, p. 293).

Regarding a follow-up visit on July 6, 2012, Dr. Bridgers noted that over the course of the

---

[5]The designation "at 85" refers to the page number (indicated at the top of the page) assigned by the Court's electronic filing system within the cited document (in this instance, document 9-3). The designation "p. 84" refers to the page number (indicated at the bottom of the page) assigned within the administrative record filed by the Commissioner.

previous six months "[s]he has had 6 migraines. . . . They usually respond to a combination of Maxalt 10 mg and a Compazine suppository. . . . I will see her again in one year." (*Id.* at 46, p. 295). A report by Dr. Bridgers dated February 17, 2014, states the following:

> The patient returns for reevaluation approximately 1 ½ years after I had last seen her. She still does average one migraine [a] month, although in some months she may get none and in some months she may get two in a row. Her headaches generally respond to a combination of Maxalt MLT and a Compazine suppository.

(*Id.* at 77, p. 326).

B. Arthritis & Osteoporosis Center, P.C.

In 2012 Dr. Kumar also referred Belton to the Arthritis & Osteoporosis Center, P.C. ("AOC") due to joint pain. Belton first saw an AOC rheumatologist, Dr. Jennifer Becker, on March 26, 2012. Her chief complaint was noted as "Joint Pain." (*Id.* at 47, p. 296). It was further noted that the "[p]atient denies systemic symptoms . . . ." (*Id.*). Belton was diagnosed as having "Discoid Lupus," and it was noted that "[s]he is without . . . manifestations of Systemic Lupus Erythematosus."[6] (*Id*. at 48, p. 297). At a follow-up visit on April 19, 2012, she was again diagnosed as having "Discoid Lupus," and it was also noted that there were indicators of "probable SLE [Systemic Lupus Erythematosus]." (*Id.* at 51, p. 300).

On July 20, 2012, Dr. Becker listed a diagnosis of "SLE" as well as a diagnosis of "Discoid Lupus." (*Id.* at 54, p. 303). A notation in Dr. Becker's report indicated that certain lab

---

[6]Lupus is a "chronic inflammatory condition caused by an autoimmune disease. . . . Lupus can cause disease of the skin, heart, lungs, kidneys, joints, and nervous system. When only the skin is involved, the condition is called discoid lupus. When internal organs are involved, the condition is called systemic lupus erythematosus (SLE)." http://www.medicinenet.com/script/main/art.asp?articlekey=8066 (last visited February 8,2017).

results were "fitting for Undifferentiated Connective Tissue Disease, probable SLE. I discussed SLE with patient." (*Id.*). A report from a visit on October 15, 2012 indicates that Beltons's joints were "feeling good" and that she had "[n]o new issues." (*Id.* at 68, p. 317).

An office visit report from Dr. Becker dated March 15, 2013 is largely unremarkable. As is the case with other AOC reports, this record indicates that the "[p]atient denies systemic symptoms specifically denying fever, chest pain, SOB [shortness of breath]."(*Id.* at 74, p. 323). On July 12, 2013, Belton returned to AOC, where she was seen by APRN [Advanced Practice Registered Nurse] Anita DeAngelo and reported that "she has been well overall except for arm stiffness. . . . Some days she is more fatigued than others." (*Id.* at 94, p. 343).

On September 24, 2013, Belton was seen by AOC rheumatologist Dr. Sonia Gordon-Dole[7] for the first time. The report of that visit indicates that during the period of her treatment by Dr. Becker, Belton "had intermittent join pain," and that "[h]er main concern is the scarring from her skin." (*Id.* at 89, p. 338). At an AOC office visit on December 6, 2013, she was seen again by APRN DeAngelo and "[d]eni[ed] joint symptoms, pain or swelling" and "report[ed] no new skin or other symptoms." (*Id.* at 85, p. 334 and at 87, p. 336).

On March 20, 2014, Belton was seen for a second time by Dr. Gordon-Dole. The chart note from that visit again refers to "intermittent joint pain" and states that "[h]er main concern is the scarring from her skin." (*Id.* at 78, p. 327). Under the heading "Lifestyle" the note states, "Vigorous activity level. Exercises daily." (*Id*. at 81, p. 330).

Dr. Gordon-Dale wrote a letter to plaintiff's counsel, dated May 14, 2014, in response to

---

[7]The plaintiff testified at the hearing that she started seeing Dr. Gordon-Dale because Dr. Becker had moved out of state.

a letter from counsel "which indicated that you represent Sharyl Belton in her claim for social security disability insurance benefits." (*Id.* at 137, p.386). Dr. Gordon-Dale's letter included the following statements:

> Mrs. Belton has Systemic Lupus erythematosus and features of a mixed connective tissue disease. She has constitutional symptoms, involvement of skin, hair, and joints and laboratory evidence of lupus . . . . She has severe depression which is most likely due to central nervous system involvement and has been limited by disabling daily refractory migraines and severe malaise and fatigue, despite ongoing treatments. She has difficulty with activities of daily living and cannot complete tasks necessary to maintain employment.
> * * * *
> She meets criteria for Listing 14.02 Systemic lupus erythematosus. She was diagnosed with systemic lupus and placed on systemic treatment 4/19/2012 and therefore it is evident that she met criteria before and on March 31 2013.

(*Id.* at 137, p. 386).

C. Agency Consulting Physicians

In addition to reports from treating providers, the record also contains the determinations of two state agency consulting physicians that Belton's "[a]llegations of total disability due to impairments are not fully supported by the objective evidence in [the] file." (Doc. # 9-4, at 7, p. 101 and at 19, p. 113). One of the consulting physicians found that Belton was capable of performing past relevant work (layout designer) with some limitations. The other consultant determined that she was capable of performing work at a light exertional level with some climbing limitations.

Hearing Testimony

At the May 16, 2014 hearing before the ALJ, Belton testified that in the year or two before she first saw Dr. Becker she was "extremely depressed . . . [and] was sick all the time."

(Doc. # 9-3, at 44, p. 43). With regard to that same time period, she stated that she "could have [migraines] a couple times a day. I could have them a couple times a week." (*Id.*). She testified further that she knew these headaches were migraines "because immediately I get nauseous, and . . . cannot eat for three days. . . . I don't do anything for three days when I get a migraine." (*Id.* at 45, p. 44).

Belton testified that she had a long-standing diagnosis of lupus and that when her lupus flared up, "I'm in bed. I can't do anything." (*Id.*). She testified further that she had lupus flare ups "at least once a month," and that during a flare up "my lupus hurts every bone in my body." (*Id.* at 46, p. 45).

At a later point in her hearing testimony, Belton stated that with respect to her health in March 2012, and before then, she had on average one "episode" a month" that typically would leave her bed-ridden for three days. (*Id.* at 57, p. 56). She associated these episodes with both her migraines and her lupus. She then testified that "in the time we are talking about, 2012," she "would get them [i.e., the 'episodes'] a couple of times a week." (*Id.*).

Belton acknowledged that she did not take medication for depression and did not see a doctor or therapist for depression between the alleged onset date of March 15, 2012 and her last insured date of March 31, 2013.

With regard to her normal physical activities during the relevant time period, Belton testified that she would make sure her son left for school on time and then would lie down for an hour or two, call her parents and give them a ride to a medical appointment if she felt well enough to assist them, cook once a week, go out to dinner with friends once a week, attend church at least twice a month, and do household chores and shopping.

A vocational expert, Richard Hall, also testified at the May 16, 2014 hearing. In response to a hypothetical question posed by the ALJ, the vocational expert testified that an individual of Belton's age, education, and past work experience who is capable of light work with occasional climbing could perform Belton's past work, as well as other jobs that exist in the national and regional economy as identified by the expert, e.g., mail sorter, order caller, office helper. The vocational expert testified further that there would be no work available for an individual who required one rest period per hour lasting from 15 to 20 minutes, or who would miss three days of work per month on a sustained basis.

## The ALJ's Decision

In her decision, the ALJ found that Belton had not engaged in substantial gainful activity since the alleged onset date of March 15, 2012, and had the following severe impairments: SLE and migraines. She also found, however, that Belton did not have an impairment that met or equaled the severity requirements of an impairment listed in the pertinent regulations. The ALJ further determined that Belton had the residual functional capacity to perform light work with certain limitations and that there were jobs that exist in significant numbers in the national economy that she could perform. Consequently, the ALJ concluded that Belton was not disabled for purposes of the Social Security Act.

In reaching her decision, the ALJ afforded "little weight to the opinion of Dr. Gordon-Dole, as it is inconsistent with the longitudinal treatment notes during the pertinent period." (Doc. # 9-3, at 23, p. 22).  The ALJ also noted that "[i]n addition to being inconsistent with the overall medical evidence, Dr. Gordon-Dole's opinion is less persuasive because [s]he treated the claimant after the date last insured." (*Id.*).

The ALJ gave "probative weight as expert opinion evidence by a non-treating source" to the opinions of the state agency consulting physicians. The ALJ found that these opinions were "consistent with the medical evidence, . . . with the claimant's physical examinations, . . . [and] with the claimant's level of daily activities that involves household chores and assisting her elderly parents at times." (*Id.* at 24, p. 23). The ALJ also found that Belton's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible . . . ." (*Id.* at 22, p. 21).

## STANDARD

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205 (g) of the Social Security Act, 42 U.S.C. § 405 (g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive . . . ." 42 U.S.C. § 405 (g). Accordingly, the court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Id.*; *Wagner v. Secretary of Health and Human Services*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching her conclusion, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Further, if the Commissioner's decision is supported by substantial evidence and not affected by legal error, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position.

*Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

The Second Circuit has defined "substantial evidence" as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence must be "more than a mere scintilla or a touch of proof here and there in the record." *Williams*, 859 F.2d at 258.

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423 (a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." 42 U.S.C. § 423 (d)(1). In order to determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.[8]

In order to be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423 (d)(2)(A).

---

[8] The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider her disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work; and (5) if the claimant is unable to perform her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920 (a)(4)(i)-(v).

"'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*[9]

## DISCUSSION

### A. Listed Impairment

Belton argues that the ALJ improperly concluded that she did not have an impairment that is equivalent to a listed impairment. Specifically, she contends that her lupus met Listing 14.02 in the regulations. A claimant whose impairment meets or exceeds the severity requirements of an impairment listed in the pertinent regulations is automatically considered disabled under the Commissioner's evaluation process.

The Commissioner responds that the ALJ's decision that Belton did not have an impairment equivalent to a listed impairment is supported by substantial evidence of record. Specifically, the Commissioner argues that the medical evidence, including the opinions of the state agency consulting physicians, supports the ALJ's decision in this regard.

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The medical criteria specified for Listing 14.02 are:

Systemic lupus erythematosus . . . [w]ith:

---

[9]The determination of whether such work exists in the national economy is made without regard to: (1) "whether such work exists in the immediate area in which [the claimant] lives"; (2) "whether a specific job vacancy exists for [the claimant]"; or (3) "whether [the claimant] would be hired if he applied for work." 42 U.S.C. § 423 (d)(2)(A).

> A. Involvement of two or more organs/body systems[10], with:
> 1. One of the organs/body systems involved to at least a moderate level of severity; and
> 2. At least two of the constitutional symptoms or signs (severe fatigue,[11] fever, malaise, or involuntary weight loss).
> or
> B. Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level[12]:
> 1. Limitation of activities of daily living.
> 2. Limitation in maintaining social functioning.
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 CFR pt. 404, subpt. P, App. 1 (pt. A), § 14.02.

Part A of Listing 14.02

As to part A of Listing 14.02, Belton argues that "the ALJ erred in not finding that claimant had two body systems involved, those being mental and skin." (Doc. # 13, at 15). Her contention that her mental system was involved appears to be based on the inclusion of the medication "Escitalopram"[13] on a handwritten list of medications submitted by Belton in 2014 in

---

[10] Pertinent body systems include: respiratory, cardiovascular, renal, hematologic, skin, neurologic, mental, and immune systems. *See* 20 CFR pt. 404, subpt. P, App 1 (pt. A), § 14.00D(1)(a).

[11] "Severe fatigue means a frequent sense of exhaustion that results in significantly reduced physical activity or mental function." 20 CFR pt. 404, subpt. P, App 1 (pt. A), § 14.00C (2).

[12] Marked "means more than moderate but less than extreme." 20 CFR pt. 404, subpt. P, App 1 (pt. A), § 14.00I(5). A marked limitation "seriously interferes with [a person's] ability to function independently, appropriately, and effectively." *Id.*

[13] "Escitalopram is used to treat depression and anxiety." www.webmd.com/drugs/2/drug-63989/escitalopram-oxalate-oral/details (last visited February 8, 2017).

connection with her application for DIB, and on Dr. Gordon-Dale's statement in her May 14, 2014 letter to counsel that Belton "has severe depression." (Doc. # 9-7, at 61, p. 243 and Doc. # 9-8, at 137, p. 386). Nothing has been brought to the Court's attention indicating that Belton had been diagnosed with, or treated for, a mental disorder at any time prior to her last insured date of March 31, 2013. In the Activities of Daily Living form she submitted in connection with her application for DIB in 2012, Belton did not include Escitalopram on the list of medications she was taking. (Doc. # 9-7, at 15, p. 197). A subsequent medication list submitted by plaintiff's counsel, which identified each prescribing physician and the reason for the medication, likewise did not include Escitalopram. (*Id.* at 54, p. 236). The list submitted shortly before the administrative hearing in 2014 that did include Escitalopram failed to indicate either the physician who had prescribed the listed medications or the purpose for which the medications were taken. Additionally, Belton acknowledged at the hearing that she did not take medication for depression and did not see a doctor or therapist for depression between the alleged onset date of March 15, 2012 and her last insured date of March 31, 2013.

Apart from the question of whether Belton had demonstrated that her lupus involved more than one body system, the ALJ also found that Belton's reported activities, i.e., doing household chores, assisting her elderly parents, and caring for her son, were "not indicative of marked limitations in functioning. Consequently, the claimant's lupus failed to meet or medically equal the criteria of listing 14.02." (Doc. # 9-3, at 19, p. 18).

The Court concludes that Belton failed to show that her impairment met all of the specified criteria of part A of Listing 14.02 and that the ALJ did not err with regard to this issue.

Part B of Listing 14.02

As to part B of Listing 14.02, Belton makes the following argument: "It is clear . . . that claimant suffers from fatigue, malaise and depression. With regard to the B criteria, the [ALJ] erred in failing to consider how much claimant's fatigue limited her activities and social functioning." (Doc. # 13, at 15-16, pp. 13-14). Although there is medical evidence that Belton experienced fatigue, part B of Listing 14.02 requires "severe fatigue," i.e., "a frequent sense of exhaustion that results in significantly reduced physical activity or mental function." 20 CFR pt. 404, subpt. P, App 1 (pt. A), § 14.00C (2). Based on Belton's own statements, the ALJ concluded as follows with regard to her fatigue: "Although she has complained of fatigue at times, she is able to do household chores and assist her elderly parents in addition to caring for her son. This is not indicative of marked limitations in functioning." (Doc. # 9-3, at 19, p. 18).

Part B of Listing 14.02 requires "[r]epeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)."  With regard to a second constitutional symptom or sign, although Belton asserts that she clearly suffered from malaise, she does not cite to any evidence in support of that claim. The Court concludes that Belton has failed to show that she has an impairment that manifests "*all* of the specified medical criteria," *Sullivan*, 493 U.S. at 530, of Listing 14.02. Therefore, the motion to reverse on this ground is denied and the motion to affirm is granted.

B. Application of Treating Physician Rule

Belton argues that the ALJ failed to properly consider Dr. Gordon-Dole's conclusions. Specifically, she contends that the ALJ misapplied the treating physician rule, because "the opinions of the treating physician [in this case Dr.Gordon-Dole] are *binding* on the fact finder

unless contradicted by substantial evidence to the contrary." (Doc. # 13, at 14, p. 12).

The Commissioner responds that the ALJ properly considered Dr. Gordon-Dole's opinion. Specifically, she argues that Dr. Gordon-Dole's opinion was contradicted by the medical evidence from the relevant time period and was inconsistent with Belton's self-reported activities of daily living, as well as with the doctor's own treatment notes.

"[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Mariani v. Colvin*, 567 F. App'x 8, 10 (2d Cir. 2014) (holding that "[a] treating physician's opinion need not be given controlling weight where it is not well-supported or is not consistent with the opinions of other medical experts" where those other opinions amount to "substantial evidence to undermine the opinion of the treating physician."). "The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion." *Shrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009). In determining the amount of weight to give to a medical opinion, the ALJ considers the examining relationship, the treatment relationship, the length of treatment, the nature and extent of treatment, evidence in support of the medical opinion, consistency with the record, specialty in the medical field, and any other relevant factors. 20 C.F.R. § 404.1527.

In her May 14, 2014 letter to Belton's attorney, Dr. Gordon-Dole opined that Belton "meets criteria for Listing 14.02" and had met these criteria "before and on March 31 2013."

(Doc. # 9-8, at 137, p. 386). The ALJ addressed this opinion as follows:

> The undersigned affords little weight to the opinion of Dr. Gordon-Dole as it is inconsistent with the longitudinal treatment notes during the pertinent period. The claimant's previous rheumatologist, Dr. Becker, reported some flares of her lupus, but these were effectively controlled with medications. The claimant's neurologist, Dr. Bridgers, also reported that her interment [sic] migraines were effectively controlled with medications. Her primary care physician, Dr. Kumar, only saw the claimant as needed and noted that review of her symptoms was unremarkable. In addition to being inconsistent with the overall medical evidence, Dr. Gordon-Dole's opinion is less persuasive because [s]he treated the claimant after the date last insured. . . .There is no evidence to support her allegation that the claimant has severe depression or difficulties with her activities of daily living.

(Doc. # 9-3, at 23, p. 22). Dr. Gordon-Dole first saw Belton on September 24, 2013. In her report concerning that visit, Dr. Gordon-Dole noted that Belton's "main concern is the scarring from her skin" and that she "had had intermittent joint pain and was placed on Plaquenil 4/19/2012." (Doc. # 9-8, at 89, p. 338). Dr. Gordon-Dole's report from a second office visit by Belton on March 20, 2014 notes again that Belton's "main concern is the scarring from her skin" (*Id.* at 78, p. 327). Under the heading "Lifestyle" that report states, "Vigorous activity level. Exercises daily." (*Id.* at 81, p. 330). The record before the Court contains only these two treatment notes from Dr. Gordon-Dole, both of which concern treatment provided well after the last insured date of March 31, 2013.

The ALJ's finding that the opinion expressed in Dr. Gordon-Dole's March 14, 2014 letter to Belton's attorney was inconsistent with the treatment notes generated during the pertinent time period is clearly supported by substantial evidence, including Dr. Gordon-Dole's own treatment notes, as well as those of the other treating physicians identified by the ALJ in her decision. The Court concludes that the ALJ did not err in affording little weight to the opinion expressed by Dr.

Gordon-Dole in her March 14, 2014 letter. Therefore, Belton's motion to reverse on this ground is denied and the Commissioner's motion to affirm is granted.

## C.  Credibility - Pain Symptoms

Belton also argues that the ALJ failed to properly consider all of the evidence in finding that her allegations of disabling limitations were "greater than expected in light of the objective clinical evidence and treatment notes." (Doc. # 9-3, at 22, p. 21). The Commissioner responds that the ALJ's finding with respect to Belton's credibility was proper and is supported by substantial evidence in the record.

In evaluating a claimant's subjective complaints of symptoms and the limiting effects of those symptoms, the ALJ must engage in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about [her] impairments, [her] restrictions, [her] daily activities, [her] efforts to work, or any other relevant statements [she] makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks, citations and alterations omitted).

The ALJ "is not required to accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of

the other evidence in the record." *Id.* At the same time, however, "[a] finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988).

With regard to the first step, the ALJ found that "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms . . . ." (Doc. # 9-3, at 22, p. 21). As to the second step, however, she found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (*Id.*). The ALJ further explained her reasoning regarding Belton's credibility as follows:

> The medical evidence shows that the claimant has been experiencing headaches prior to her amended onset date [of March 15, 2012] and was prescribed the appropriate medications. Subsequent to . . . the onset date, she did not complain that the intensity or the frequency of her migraines increased. It appears that she was experiencing about one migraine per month and she admitted that her migraines usually responded to the medications that she had been prescribed. She also indicated that she experienced nausea with her migraines, but there is little evidence that she complained of ongoing nausea after being started on . . . suppositories. . . . With regard to her lupus, the medical evidence shows that the claimant reported symptoms such as rashes and fatigue. Although laboratory testing has shown elevated antibody titers and sedimentation rates, the claimant's lupus has responded well to medication. She has continuously denied systemic lupus symptoms or joint pain/ swelling. After her rheumatologist, Dr. Becker, started her on medication, the claimant reported no new skin lesions/sores and that her joints felt well. . . . Even after her date last insured [March 31, 2014], the claimant continues to be treated with the same medications and has complained of no new issues, indicating that her medication regimen works well. Furthermore, the claimant has been able to assist her elderly parents in addition to caring for her own household. There is no evidence of her experiencing depression as she alleged during the relevant time period. The undersigned has taken into account any limitations stemming from the claimant's impairments such as

>fatigue, occasional spine tenderness, and occasional migraines.
>Thus, the claimant is limited to the limited range of light work with
>the postural restrictions identified.

(Doc. # 9-3, at 22, p. 21 and 23, p. 22).

It is apparent that the ALJ did consider all of the evidence in connection with her determination of Belton's credibility as to her symptoms and the limiting effects of those symptoms. This evidence included treatment notes from Belton's treating physicians, Belton's statements to her physicians denying specific symptoms, and her self-reported activities of daily living. As noted earlier in this ruling, in the absence of legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence. With specific reference to credibility determinations, the Second Circuit has stated that "[c]redibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." *Pietrunti v. Director, Office of Workers' Compensation Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted). In light of the evidence that was before the ALJ, the Court cannot say that her findings as to Belton's credibility are patently unreasonable. Consequently, this Court must defer to those findings and conclude that the ALJ's credibility determination is supported by substantial evidence. Therefore, Belton's motion to reverse on this ground is denied and the Commissioner's motion to affirm is granted.

CONCLUSION

For the reasons stated above, Belton's motion to reverse and/or remand (**doc. # 13**) is **DENIED** and the Commissioner's motion to affirm (**doc. # 14**) is **GRANTED**.

Judgment shall enter in favor of the defendant. The Clerk is directed to close the file.

SO ORDERED this    9th        day of March,  2017.


　　　　　　　　　　   /s/ DJS
　　　　　　　　　Dominic J. Squatrito
　　　　　　　　United States District Judge